\*\*E-Filed 6/8/2010\*\*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| RONALD M. NAKAMOTO, | Case Number C 09-05193 JF (HRL) |
| Plaintiff, | ORDER[1] GRANTING MOTION FOR SUMMARY ADJUDICATION AND MOTION TO STRIKE |
| v. | |
| LOCKHEED MARTIN CORPORATION, | [re: document no. 6] |
| Defendant. | |

## I. BACKGROUND

**A. Factual Background**

**1. Alleged Discrimination**

The instant action arises out of an employment dispute between Plaintiff Ronald Nakamoto ("Plaintiff") and Defendant Lockheed Martin Corporation ("Defendant"). Plaintiff was employed by Defendant from 1985 until his retirement in 2009. Complaint ¶ 12. "In 2006, the last evaluation Plaintiff received prior to his demotion indicated that his performance was 'vastly superior' to his peers." *Id.* ¶ 15. In December 2006, Plaintiff was appointed as Chief

---

[1] This disposition is not designated for publication in the official reports.

Operating Officer ("COO") of Savi Group and Vice President and General Manager of Global InTransit Visibility ("GITV"), a business unit within Savi Group. In April 2007, Plaintiff was appointed Chief Executive Officer of Savi Technologies. *Id.* ¶ 16.

In March 2007, Linda Gooden was promoted to Executive Vice President of Lockheed Martin Integrated Systems and Solutions and became Plaintiff's supervisor. *Id.* ¶ 18. During a meeting of several Lockheed officials on October 26, 2007 Gooden made the following allegedly false statements about Plaintiff: "(i) 'he is an introvert;' (ii) 'he is not a good business leader;' (iii) assigning him to be the VP of Engineering for Savi Technology 'should be good for him since he would only have to deal with inside matters;' (iv) 'since Ron is an introvert, he should be happy with this position,' and (v) 'despite these leadership shortcomings, 'he is good technically.'" *Id.* ¶ 19. On that same day, Defendant replaced Plaintiff with Robert Kramer as COO of Savi Group and offered Plaintiff a "newly created position of Vice President Engineering for Savi Group." Complaint ¶¶ 21, 23. Plaintiff alleges that the offered position constituted a demotion "since the position would report to the COO (Kramer), did not involve leading a business unit and was a plain diminution in material responsibility and authority from his previous positions. This position would result in previous direct report employees assuming peer and supervisory status over Nakamoto." *Id.* ¶ 23.

Plaintiff, who is Asian-American, alleges that he was demoted because of his race and replaced with a Caucasian executive who was less qualified for the position. *Id.* ¶¶ 21-22 (alleging the following comparative facts: (1) at the time of his demotion Plaintiff "had served at the rank of business unit leader with the title 'Vice President and General Manager,'" while the "highest rank Kramer had obtained was 'Vice President'"; (2) Plaintiff "had 33 years of experience in the business, Kramer had 20 years of experience;" (3) Plaintiff "had led a $1.5 billion dollar business with 3,300 employees. Kramer had led a $140 million dollar business with 450 employees"; (4) Plaintiff "had led six businesses; Kramer had led one"; (5) Plaintiff "had won $3.2 billion dollars in orders, achieved a 99% 'win rate,' received a performance evaluation of 'vastly superior' to his peers and had been named Asian-American Engineer of the year by the Chinese Institute of Engineers-USA" while "Kramer had managed a single program

2

1  with no wins"; (6) Plaintiff served as program manager on thirteen programs and rated as one of
2  two master program managers within the company compared to Kramer who had been program
3  manager for only one program and was not rated within the company; and (7) Plaintiff developed
4  two technology start-up companies and Kramer had no similar experience).

5      After assuming his new position, Plaintiff complained of discrimination to his superiors.
6  Plaintiff alleges that Defendant then retaliated by removing him from all positions within
7  Lockheed as of November 9, 2007. *Id.* ¶¶ 24, 26.

8      **2. Release Agreement**

9      In the spring and early fall of 2008, the parties engaged in negotiations regarding the
10  employment dispute presently before the Court. Declaration of Ronald Nakamoto ("Nakamoto
11  Decl.") ¶ 8. On September 16, 2008, Kimberly Adams, Defendant's Vice President of Human
12  Resources, Enterprise Operations, sent Plaintiff a Draft Confidential Agreement and Release
13  ("Draft Release Agreement").[2] The Draft Release Agreement expressly provided that Plaintiff
14  would have a twenty-one day period within which to consider signing the release and seven days

---

[2] Paragraph five of the executed Agreement identified the "Claims Released," including in pertinent part:

> In consideration of the Benefits provided to you under this Agreement...you... hereby agree to waive and irrevocably and unconditionally fully release, acquit and forever discharge from liability any of the Released Parties listed below for any and all claims, demands, losses, liabilities, promises, and causes of action or similar rights of any nature or type whatsoever (known and unknown) that you may now have or have had with respect to any of the Released Parties arising on or before the date this Agreement is signed, as a result of or because of any act, omission, or failure to act by the Released Parties, including but without limitation those arising out of or relating in any way to your employment by, association with Corporation (hereinafter collectively referred to as "Claims"). THIS IS A GENERAL RELEASE, subject only to the specific exceptions set forth in paragraphs 5(b) and 5(c).
>
> (a) Claims released include, but are not limited to, any claims...under Title VII of the Civil Rights Act of 1964, Executive Order 11246, the Civil Rights Act of 1991, Section 1981...or any other local, city, county, state or federal statutes, laws, regulations or ordinances prohibiting harassment, discrimination or retaliation on these or any other grounds or otherwise governing the employment relationship.

Nakamoto Decl. Ex. A, ¶ 5(a).

3

1  to revoke the agreement after signing.  Declaration of Kimberly Adams ("Adams Decl.") ¶ 2.
2  Negotiations continued and Defendant "agreed to extend the consideration period of the Draft
3  Release Agreement first to October 17, 2008, and later to October 27, 2008." *Id.* ¶ 3.
4    On October 23, 2008, Adams sent Plaintiff a revised version of the Confidential
5  Agreement and Release (Agreement).  *Id.* ¶ 4.  On October 27, 2008, Plaintiff signed the
6  Agreement after making two changes.  *Id.,* Ex. A; *see also* Nakamoto Decl. ¶ 8, Ex. A
7  (Agreement).  Plaintiff's changes related to the role of executive discretion in his "transitional
8  employment" and eliminated the underlined and bolded language in the passage quoted below:

> (b) Transitional Employment.  In the role of Vice President and Managing Director for Technology Transition, Corporate Engineering and Technology, which is a rotational assignment that you will assume effective immediately, you will receive an annual salary of $REDACTED retroactive from the effective date of this Agreement to February 1, 2008.  You are eligible to remain in this rotational position for up to 3 years, ending September 1, 2001, with senior executive approval **and** based on your satisfactory performance against established objectives.  At the end of the rotational assignment, **or prior to that time in the absence of senior executive approval and satisfactory performance,** you acknowledge and agree that you will: i) transition to another position within the Corporation, which you will be responsible for identifying and obtaining an offer; ii) accept reassignment to an equivalent position that may be offered by the Corporation; or iii) retire from the Corporation.

Adams Decl., Ex. A ¶ 3(b); Nakamoto Decl., Ex. A ¶ 3(b).

  On October 30, 2008, Adams informed Plaintiff in writing that Defendant had accepted Plaintiff's interlineations and confirmed that the seven-day revocation period identified in the Agreement had commenced.  Adams Decl. ¶ 5; Nakamoto Decl. Ex. C (email exchange between Adams and Plaintiff in which Plaintiff stated on October 28 that, "I would like to verify that the 7 day wait period is now in effect..." and Adams replied on October 30 that "the revocation period has started.").  On November 4, 2008, Plaintiff attempted to revoke the Agreement.  Adams Decl. ¶ 6; Nakamoto Decl., Ex. D.  Adams informed Plaintiff that "his revocation was untimely because it occurred eight days after Nakamoto signed the Release Agreement, rather than the seven days provided for in the Release Agreement."  Adams Decl. ¶ 6.

  Following their execution of the Agreement, the parties took the following steps in compliance with its terms: (1) "Nakamoto accepted a position as Vice President and Managing Director for Technology Transition in the Corporate Engineering and Technology organization.

4

His annual salary increased to the agreed upon amount in the Release Agreement, retroactive to February 1, 2008, and he was eligible to participate in the same benefits for which he was eligible prior to accepting this position"; (2) Defendant paid Plaintiff "a lump sum payment equal to the agreed upon amount in the Release Agreement"; (3) "the Board of Directors ratified and approved Nakamoto's stock options and [restricted stock units] RSUs with an aggregate economic value equal to the agreed upon amount in the Release Agreement"; (4) Defendant provided Plaintiff with a Management Incentive Compensation Plan ("MICP") payment equal to the amount agreed upon in the Agreement; and (5) Plaintiff's "eligibility to participate in Lockheed's employee benefit plans continued until his eligibility terminated when he retired from Lockheed on June 30, 2009." *Id.* ¶ 7.

Plaintiff has not "returned the salary, salary increase, lump sum payment, or MICP payment that he received under the terms of the Release Agreement." *Id.* ¶ 8. Plaintiff alleges that while he is "still in possession of proceeds presented to [him] by Lockheed as part of the revoked Release Agreement, less federal and state withholdings," he "attempted to reach agreement with Lockheed about a tender back of all sums with accommodations for taxes and other sums withheld as it was [his] belief that Lockheed would have methods for obtaining refunds of those sums", but that "Lockheed never responded to [his] inquiries on this subject." Nakamoto Decl. ¶ 14. Plaintiff also asserts that he remains "ready, willing and able to tender back net proceeds paid to [him] by Lockheed with adjustments, as applicable, for taxes and other sums withheld." *Id.* Finally, Plaintiff alleges that the attorney's fees he received as part of the consideration of the Agreement were returned to Defendant by his counsel "shortly after receipt." *Id.*

**B. Procedural History**

Plaintiff filed the instant action on November 3, 2009, alleging the following claims for relief:  (1) wrongful demotion in violation of 42 U.S.C. § 1981; (2) constructive discharge in violation of 42 U.S.C. § 1981; (3) retaliation in violation of 42 U.S.C. § 1981; (4) breach of employment contract; and (5) breach of covenant of good faith and fair dealing. On February 12, 2010, Defendant moved to dismiss Plaintiff's claims for relief based on events that occurred

prior to the date upon which Plaintiff signed the Agreement. Defendant also moved in the alternative for summary adjudication with respect to the same claims. Finally, Defendant moved to strike any references to the subject events from the complaint. Plaintiff opposes the motions. For the reasons discussed below, the motion for summary adjudication and motion to strike will be granted.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Medical Center*, 521 F.3d 1097, 1104 (9th Cir.2008). For purposes of a motion to dismiss, "all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

### B. Rule 56 Motion for Summary Adjudication

Summary judgment or adjudication is appropriate when there are no genuine and disputed issues of material fact and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). "If conflicting inferences may be drawn from the facts, the case must go to the jury." *Id.* The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other

6

evidentiary material. *Celotex*, 477 U.S. at 324.

**C. Motion to Strike Portions of Complaint**

Pursuant to Federal Rule of Civil Procedure 12(f), the court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Where the damages sought in a prayer for relief are not recoverable as a matter of law, a motion to strike maybe used to strike the prayer for such damages. *Bureerong v. Uvamas*, 922 F. Supp. 1450, 1479, n.34 (C.D. Cal. 1996), citing *Tapley v. Lockwood Green Engineers, Inc.,* 502 F.2d. 559, 560 (8th Cir. 1974); *Wilkerson v. Butler,* 229 F.R.D. 166, 172 (E.D. Cal. 2005).

The grounds for a motion to strike must appear on the face of the complaint or from matter which the court may judicially notice and the court must view the pleading in the light most favorable to the pleader. *SEC v. Sands,* 902 F. Supp. 1149, 1165 (C.D. Cal. 1995); *Lazar v. Trans Union LLC,* 195 F.R.D. 665, 669 (C.D. Cal. 2000), citing *California v. United States,* 512 F.Supp. 36, 39 (N.D. Cal. 1981). The central function of a Rule 12(f) motion is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).

**III. DISCUSSION**

**A.  Documents Considered**

"[A]lthough a court generally may not consider matters beyond the pleadings on a Rule 12(b)(6) motion, 'when [the] plaintiff fails to introduce a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleadings.'" *S.M. v. W. Contrac Costa Cty. Unified Sch. Dist. Fin. Corp.*, No. 07-5829 CW, 2009 WL 1033826, at *3 (N.D. Cal. Apr. 16, 2009), quoting *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds, Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). This rule "[p]revent[s] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *abrogated on other grounds by Abrego v. Dow Chemical Co.*, 443 F.3d 676 (9th Cir. 2006). The Agreement was

7

neither referred to in Plaintiff's complaint nor attached to his pleading. However, the document is pertinent to the pleading in that it may, depending on its legal effect, bar Plaintiff's claims for relief based on events that preceded its execution. Plaintiff does not object to the Court's consideration of the Agreement on the instant motion to dismiss and in fact attaches the Agreement as an exhibit to his own declaration. Nakamoto Decl., Ex. A. Accordingly, the Court could consider the Agreement within an analysis of the motion to dismiss.

However, Plaintiff also presents additional evidence in support of his opposition that is relevant and necessary with respect to the proper construction of the Agreement. Because it must rely upon evidence extrinsic to Plaintiff's pleading and the Agreement itself to resolve the question of whether Plaintiff may continue to assert the concerned claims for relief, the Court will address Defendant's alternative motion pursuant to Fed. R. Civ. P. 56.

**B. Motion for Summary Adjudication[3]**

"According to the California Supreme Court, a release is the 'abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced ... and its effect is to extinguish the cause of action.'" *Marder v. Lopez*, 450 F.3d 445, 449 (9th Cir. 2006), quoting *Pellett v. Sonotone Corp.,* 26 Cal.2d 705, 160 P.2d 783, 787 (1945); *see also* Cal. Civ.Code § 1541. "'In general, a written release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence.'" *Id.*, quoting *Skrbina v. Fleming Cos.,* 45 Cal.App.4th 1353, 53 Cal.Rptr.2d 481, 489 (1996).

The Agreement signed by Plaintiff on October 27, 2008, expressly releases Defendant from claims arising under 42 U.S.C. § 1981 arising from events that occurred prior to the execution of the Agreement, including Plaintiff's alleged demotion. The Agreement states:

> Claims released include, but are not limited to, any claims. . .by you or by a person claiming to act on your behalf or in your interest under. . .the Civil Rights Act of 1991, Section 1981. . .or any other local, city, county, state or federal

---

[3] The facts as they relate to the enforceability of the Agreement are undisputed. Accordingly, there are no genuine issues of material fact, and the Court may adjudicate the enforceability of the Agreement on Plaintiff's claims arising prior to October 27, 2008 as a matter of law.

8

> statutes, laws, regulations or ordinances prohibiting harassment, discrimination or retaliation on these or any other grounds or otherwise governing the employment relationship.

Adams Decl., Ex. A, ¶5(a). Plaintiff does not contest that his claims arising from events prior to October 27, 2008 would be barred by the Agreement if it were valid, but he contends that the Agreement is unenforceable because: (1) he timely revoked the Agreement, or in the alternative the Agreement was never formed; and (2) the Agreement violates the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f).

**1. Whether revocation was timely or the agreement was never formed**

The Agreement clearly and conspicuously states that Plaintiff "may revoke this Agreement within **seven (7) calendar days** from the date of signing, in which case this Agreement shall be null and void and of no force and effect on the Released Parties or you and **that this Agreement shall not become effective or enforceable until the revocation period has expired."** Nakamoto Decl., Ex. A ¶ 15(c) (emphasis in original). This language is consistent with the requirement of the OWBPA that an agreement releasing claims under the Age Discrimination in Employment Act ("ADEA") "provide[] that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired." 29 U.S.C. § 626(f)(1)(G).

It is undisputed that Plaintiff signed the Agreement on October 27, 2008 and that he did not attempt to revoke the Agreement until November 4, eight calendar days later. However, Plaintiff points out that when he signed the Agreement on October 27, he also made two material changes to it.[4] Plaintiff argues that the changes constituted a counter-offer as to which Defendant's acceptance was necessary before a contract could be formed. *See Roth v. Malson*, 67 Cal.App.4th 552, 557 (1998), quoting Cal. Civ. Code § 1585 ("An acceptance must be absolute and unqualified, or must include in itself an acceptance of that character which the proposer can separate from the rest, and which will conclude the person accepting. A qualified

---

[4] Defendant does not dispute Plaintiff's characterization of the changes as material.

acceptance is a new proposal); *see also . Landberg v. Landberg*, 24 Cal.App.3d 742, 750 (1972) (internal citations omitted) (holding that "basic principles of the law of contract" include: "(1) a valid acceptance must be absolute and unqualified, and (2) qualified acceptance constitutes a rejection terminating the offer; it is a new proposal or counteroffer which must be accepted by the former offeror now turned offeree before a binding contract results."). It is undisputed that Defendant's first indication of assent to Plaintiff's changes to the Agreement was communicated on October 30, 2008. Adams Decl. ¶ 5 (stating that Adams "notified Nakamoto in writing that Lockheed had accepted the interlineation Nakamoto had made..."); Nakamoto Decl., Ex. C (email from Adams to Plaintiff stating "I will initial the changes on Monday when I return to the office from travel. Please note the revocation period has started). Plaintiff contends that his revocation on November 4 thus was timely because it occurred within seven days of Defendant's earliest expression of assent.

However, the plain language of the Agreement, as well as regulatory interpretation of the OWBPA, indicates that the seven-day revocation period commences upon the *employee's* execution or signature, not the employer's communication of assent. The Agreement states, "you may revoke this Agreement within seven (7) calendar days from the *date of signing.*" Nakamoto Decl., Ex. A ¶ 15(a) (emphasis added). The regulations of the Equal Employment Opportunity Commission ("EEOC") interpreting the seven-day requirement provide that "an employee may *sign* a release prior to the end of the 21 or 45 day time period, thereby *commencing the mandatory 7 day revocation period.*" 29 C.F.R. § 1625.22(e)(6) (emphasis added).

Defendant's assertion that the seven-day revocation period commenced at the time Plaintiff signed the Agreement also is supported by case law. *Armstrong v. Capstone,* No. C05-1433P, 2006 WL 1875592, at *2 (W.D. Wash. July 5, 2006) (holding that "the failure of any representative of Defendant to sign the waiver" is not fatal because "the statute only requires that the agreement be in writing, not that it be signed by an agent of the employer."); *Bilton v. Monsanto Co.*, 947 F.Supp. 1344, 1349 (E.D. Mo. 1996) (concluding that because plaintiff signed the release on December 13, 1993, the Court concluded that the plaintiff "had until December 20, 1993 to revoke his acceptance"). However, neither *Armstrong* nor *Bilton*

considered the factual circumstances present here, in which the employee makes material changes to an agreement contemporaneously with his signature. In fact, in *Armstrong*, the court reasoned that "[t]he waiver constituted a written offer to Plaintiff, and the Defendant was bound to honor it upon Plaintiff's acceptance (signing) of the agreement." *Armstrong*, 2006 WL 1875592, at *2, citing Restatement (Second) of Contracts § 50 (1981) (where offeree accepts offer in manner invited or required by offeror, offeree has completed manifestation of mutual assent and intent to be bound).

Plaintiff contends that the seven-day revocation period logically could not have begun prior to Defendant's assent and the formation of the contract itself. Opp. at 7 (contending that "[t]he seven day revocation period cannot begin to run until there is an extant agreement to revoke. Otherwise the term 'revoke' is rendered nonsensical. There is simply nothing to revoke in the absence of a consummated agreement.") However, while this argument might have some force as a matter of pure contract law, the Court is not persuaded by it in this specific context. First, even if no enforceable contract had been formed at the time of Plaintiff's signature because of Plaintiff's proposed changes, nothing about those changes prevented Plaintiff from revoking his assent to the terms of the Agreement as *Plaintiff* proposed to amend it. At the time he signed the Agreement, Plaintiff had full knowledge of its terms, including the changes he had made, as well as the explicit waiver provision that indicated that he "may revoke this Agreement within **seven (7) calendar days** from the date of *signing*." Adams Decl., Ex. A ¶ 15(c) (bold in original, italics added).[5]

Second, the record reflects that Plaintiff himself believed that the seven-day revocation period began prior to Defendant's assent. On October 28, 2008, the day after Plaintiff signed the Agreement and prior to Defendant's assent to his changes, Plaintiff sent an email to Adams pointing out the changes that he had made to the Agreement and stating, "I would like to verify

---

[5] Defendant contends that even if Plaintiff's revocation of the Agreement was timely, Plaintiff's failure to tender a return of the benefits he received established Plaintiff's ratification of the terms of the contract. In light of the Court's conclusion that the seven-day revocation period lapsed prior to Plaintiff's attempted revocation, the Court need not determine the effect of Plaintiff's failure to tender.

11

that the 7 day wait period is *now in effect* as I would like the org. announcement to get out."
Adams Decl., Ex. C (emphasis added). On October 30, 2008, Adams responded, "I will initial
the changes on Monday when I return to the office from travel. Please note the revocation period
has started." *Id.* The only reasonable inference from Plaintiff's request for verification is that
Plaintiff believed that the revocation period had begun when he signed the Agreement. Adams'
response on October 30, while admittedly not as clear as her declaration suggests, is not
inconsistent with this belief. *Compare* Adams Decl. ¶ 5 ("On October 30, 2008, I notified
Nakamoto in writing that Lockheed had accepted the interlineation Nakamoto had made and that
the seven-day revocation period had begun on the day he signed the Release Agreement (October
27, 2008)") *with id.,* Ex. C (Email from Adams to Plaintiff on October 30, 2008) (replying to
Plaintiff's October 27 request for verification that the revocation period "is now in effect" by
stating "I will initial the changes on Monday when I return to the office from travel. Please note
the revocation period has started", but not specifically indicating that the revocation period began
on the day Plaintiff signed).[6]

### 2. Whether the Agreement violates the OWBPA

Plaintiff also contends that even if his attempt to revoke the Agreement occurred outside the seven-day period provided, the Agreement itself is unenforceable because it was not "knowing and voluntary" within the meaning of the OWBPA. 29 U.S.C. § 626(f). Among other mandates, the OWBPA provides that, "a waiver may not be considered knowing and voluntary unless at a minimum...(A) the waiver is part of an agreement between the individual and the employer...[and] (F)(i) the individual is given a period of at least 21 days within which to consider the agreement." 29 U.S.C. § 626(f)(1).

Plaintiff argues that the Agreement could not be "knowing and voluntary" because he

---

[6] Plaintiff also presents an alternative argument that no valid contract was ever formed because he revoked his assent prior to *Defendant* signing the Agreement. However, Plaintiff cites no case law or statutory authority in support of his contention that Defendant needed to sign the Agreement. The Court concludes that Defendant effectively assented to Plaintiff's material changes in writing by email on October 30, several days prior to Plaintiff's attempted revocation on November 4.

"extended a counter-offer and had no idea whether or not the offer would be accepted. As the facts transpired in this case, and if Lockheed's argument is accepted, the company could have rescinded any of the terms contained in the Release Agreement well after Nakamoto actually signed it." Opposition at 8. Plaintiff also argues that the Agreement violated the OWBPA because it did not comply with the statutory requirement that a twenty-one day consideration period be provided.[7] However, even if the Court were to accept Plaintiff's argument that the Agreement does not comply with the requirements established by the OWBPA, it remains enforceable as to all of Plaintiff's non-ADEA claims for relief based on events occurring prior to the execution of the Agreement. *See Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427-28, 118 S.Ct. 838 (1998) ("Since Oubre's release did not comply with the OWBPA's stringent safeguards, it is unenforceable against her insofar as it purports to waive or release her ADEA claim. As a statutory matter, the release cannot bar her ADEA suit, irrespective of the validity of the contract as to *other claims*") (emphasis added); *see also Kinghorn v. Citibank*, No. C 97-3111 FMS, 1999 WL 30534, at *4 (N.D. Cal. Jan. 20, 1999)*, citing Skrbina v. Fleming Companies*, 45 Cal.App.4th 1353, 1367-68 (1996) ("By its plain terms, 29 United States Code section 626(f)(1) applies only to rights or claims under the ADEA. It does not apply to a waiver

---

[7] It is undisputed that the original draft of the Agreement provided Plaintiff a twenty-one day consideration period. It is also undisputed that Plaintiff only had four days to consider the revised version of the Agreement that he executed on October 27, 2008. It is this four day period that Plaintiff argues was insufficient under the OWBPA. However, as Defendant asserts, the regulations interpreting the OWBPA expressly provide that "parties may agree that changes [to a release agreement], whether material or immaterial, do not restart the running of the 21 or 45 day period." 29 C.F.R. § 1625.22(e)(4) (stating in full, "[t]he 21 or 45 day period runs from the date of the employer's final offer. Material changes to the final offer restart the running of the 21 or 45 day period; changes made to the final offer that are not material do not restart the running of the 21 or 45 day period. The parties may agree that changes, whether material or immaterial, do not restart the running of the 21 or 45 day period.")

The Agreement clearly states, "Acceptance of the terms of this Agreement must occur no later than October 27, 2008. *You agree that any modifications, material or otherwise, made to this Agreement do not restart or affect in any manner the original 21-day consideration period provided in the September 16, 2008 letter agreement.*" Adams Decl., Ex. A (executed Agreement). Accordingly, when Plaintiff signed the Agreement he agreed to its terms, including the fact that any modifications to the Agreement did not restart or affect the original twenty-one day consideration period.

13

Case Number C 09-05193 JF (HRL)
ORDER GRANTING MOTION FOR SUMMARY ADJUDICATION AND MOTION TO STRIKE
(JFLC1)

of claims based on state law, which are the only claims at issue in the complaint upon which summary judgment was granted...The trial court properly concluded the antiwaiver provisions of the ADEA were inapplicable to plaintiff's release of his state law claims."). Plaintiff does not allege any ADEA claims for relief. Accordingly, even if the Agreement did not comply with the mandates of the OWBPA, it would be enforceable with respect to Plaintiff's claims for violations of 42 U.S.C. § 1981, breach of contract, and breach of the covenant of good faith and fair dealing.

### C. Motion to Strike

Defendant also moves to strike portions of the complaint that relate to Plaintiff's claims based on events occurring prior to the execution of the Agreement. Motion at 1-2 (listing the allegations Defendant moves to strike). Because Defendant's motion for summary adjudication as to such claims will be granted, its motion to strike also will be granted. Fed. R. Civ. P. 12(f) (providing that the court may "strike from a pleading...redundant, immaterial, impertinent, or scandalous matter.").

### IV. ORDER

Good cause therefor appearing, Defendant's motion for summary adjudication and motion to strike are GRANTED.

DATED: 6/8/2010

_____
JEREMY FOGEL
United States District Judge